UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

BRANDON JONAS,

                Defendant.

**DECISION AND ORDER**

11-CR-366-A

---

Pending before the Court are: Defendant Brandon Jonas's motion seeking to compel the government to file a motion for downward departure under Guidelines Section 5K1.1 (Dkt. Nos. 289, 298); Jonas's supplemental motion for a downward departure (Dkt. No. 440); and Jonas's motion for release from custody (Dkt. No. 408).[1]  For the reasons which follow, Jonas's motions are **DENIED**.

**I.**    **Background:**

**A. Defendant Jonas's Prosecution:**

In November of 2012, Jonas was charged, together with codefendants Misael Montalvo and Efrain Hidalgo, in a Superseding Indictment with two counts of violating 18 U.S.C. §§ 924(c)(1)(A(iii), 924(j), and 2.  Specifically, those counts

---

[1] This Decision and Order renders moot the following pending motions previously filed by the government: (Dkt. Nos. 358, 360, 371, and 410); and defendant: (Dkt. Nos. 392 and 394).

related to trios' involvement in the November 2004 shooting homicides of Nelson and Miguel Camacho. (Dkt. No. 68).

On March 11, 2015, Jonas, pursuant to a written plea agreement with the government, pleaded guilty to two counts of violation of 18 U.S.C. § 924(c)(1)(A)(iii) (discharge of a firearm in furtherance of a crime of violence) as lesser included counts of two counts in the Superseding Indictment pending against him. (Dkt. No. 244). As part of his plea agreement, Jonas admitted to the following facts:

> On or about November 11, 2004, defendant Brandon Jonas, while aiding and abetting and being aided and abetted by Efrain Hidalgo, Misael Montalvo, and other unindicted co-conspirators, discharged a firearm during a conspiracy and attempt to forcibly steal property and extort assets from Nelson and Miguel Camacho. On or about November 11, 2004, Brandon Jonas, Efrain Hidalgo and others received information that individuals, now known to be Nelson Camacho and Miguel Camacho, might have large amounts of money or drugs and would be good targets to rob. Efrain Hidalgo, Brandon Jonas, Misael Montalvo, and other unindicted co-conspirators discussed the potential robbery and Brandon Jonas possessed an AK-47 firearm. On November 11, 2004, Misael Montalvo, driving a yellow car, drove Brandon Jonas, Efrain Hidalgo, and an unindicted co-conspirator to the vicinity of the residence of Nelson Camacho and Miguel Camacho, who lived on Niagara Street near Massachusetts Street. Brandon Jonas was armed with an AK-47 style machine gun, and Efrain Hidalgo was armed with a baseball bat. After being dropped off near the corner of Niagara and Massachusetts Streets, Efrain Hidalgo, Brandon Jonas, and an unindicted co-conspirator conducted surveillance of the residence of Nelson Camacho and Miguel Camacho. Then, after forcing entry into the residence, and in order to effectuate the robbery and extortion of assets, including large amounts of money or drugs, from Nelson and Miguel Camacho, Brandon Jonas utilized the AK-47 style firearm to shoot and kill both Nelson and Miguel Camacho. After the shootings were completed, Efrain Hidalgo, Brandon Jonas, and the unindicted co-conspirator ran from the scene of the murder to Sammy Ortiz's residence on 7th Street. The defendant admits to this conduct. (Dkt. No. 244, pp. 3-4).

The plea agreement calculated Jonas's aggregate sentencing range principally to be a term of imprisonment of 35 years. (Dkt. No. 244, ¶10).

The plea agreement also contained a cooperation section (Dkt. No. 244, pp. 9-13), which provided, *inter alia*, that:

> Upon condition that the defendant has fully complied with all terms and conditions of this agreement, should the government determine that the defendant has provided substantial assistance in the investigation or prosecution of other persons who have committed offenses, the government will move the Court at sentencing to depart downward 2 levels from the equivalent of offense level 37 from the Guidelines as provided for in Guidelines§ 5K1.1 and Title 18, United States Code, Section 3553(e), which if granted by the Court, would result in a total offense level of 35 and a sentencing range of 292 to 365 months imprisonment. The defendant understands that the decision to make such a motion is within the sole discretion of the government and that the decision to grant such a motion, and the extent of any downward departure, are matters solely within the discretion of the Court. (Dkt. No. 244, ¶24 [emphasis omitted]).

Following Jonas's plea, codefendant Montalvo, on March 16, 2015, pleaded guilty to conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846.  (Dkt. Nos. 248, 252).  In Montalvo's written plea agreement, the government reserved its right to argue that the murder of the Camacho brothers ought to be considered relevant conduct applicable to Montalvo as part of the narcotics conspiracy, while Montalvo maintained that he did not participate in the murders and that such murders were not part of his relevant conduct.  (Dkt. No. 244, ¶4(c)).

### B. Defendant Jonas's Cooperation and Codefendant Montalvo's Sentencing Proceedings

With the trial of Jonas and codefendant Montalvo scheduled to commence on March 17, 2015, Jonas, on March 6, 2015, appeared at the United States Attorney's Office to participate in a proffer. (Dkt. No. 419, ¶3). At that time, Jonas was shown the factual basis of Hidalgo's plea agreement, who previously pled guilty on February 26, 2015 (Dkt. No. 235), which, in pertinent part, identified Jonas as the person who utilized the AK-47 style firearm to shoot and kill both Nelson and Miguel Camacho. (Dkt. No. 239, ¶5(k); Dkt. No. 419, ¶3). While initially denying his involvement in the murders, in a subsequent proffer conducted on March 10, 2015, Jonas admitted to his role in the homicides. (Dkt. No. 419, ¶¶3-6). Notably, Jonas stated that he, Hidalgo, and another individual were dropped off in a yellow-colored car in the area in which the murders took place. While Jonas stated that he did not remember knowing who the driver of the yellow car was at the time, he told the government that he recalled the driver being older than him and being heavy-set. According to the government, Jonas's description of the vehicle (yellow car), and of the driver (older than him and heavy set), were consistent with the vehicle and physical descriptors attributable to codefendant Montalvo. (Dkt. No. 419, ¶7).

Following such proffer, a plea agreement, which included a cooperation section, was presented to Jonas, and on March 17, 2015, Jonas, as previously described, entered into the plea agreement. (Dkt. No. 419, ¶¶8-9).

On April 20, 2015, after Montalvo pleaded guilty and in preparation for Jonas's anticipated testimony as a witness at Montalvo's sentencing hearing, Jonas met with the government. (Dkt. No. 419, ¶10). According to the government, during that meeting Jonas changed his description of the person who drove him, Hidalgo, and another individual to the scene of the murders of Nelson Camacho and Miguel Camacho. According to the government, while Jonas continued to assert the driver drove a yellow car, "he [wa]s not sure who the driver [wa]s" and his description of the driver changed from that which he previously provided as he now stated that the driver "had dark hair, was thin, spoke Spanish and had a mustache." (Dkt. No. 419, ¶10).

In the government's view, the description of the driver given by defendant Jonas during the April 20, 2015, witness preparation session, "differed significantly from his pre-plea and plea agreement descriptions, and changed to a description [that was] inconsistent with Montalvo's physical appearance." (Dkt. No. 419, ¶10). The government further indicated that the discrepancies in the descriptions of the driver given by Jonas caused the government to treat such information as "exculpatory information" which they not only had to provide to Montalvo's lawyer, but which Montalvo himself was able to use at the sentencing hearing. (Dkt. No. 419, ¶10). As a result of his discrepancies in the descriptions he gave of the driver, Jonas was <u>not</u> called as a witness at Montalvo's sentencing hearing (Dkt. No. 419,

5

¶10), [2] which was held over a three-day period in May of 2015 and during which the Court heard from nine witnesses and received numerous items of evidence. (Dkt. Nos. 264-266; Dkt. No. 372, p.5).  Not only was Jonas not called as a government witness at Montalvo's sentencing hearing, based upon Jonas's changed description of the driver of the vehicle, Montalvo's counsel called—as a defense witness—the FBI Special Agent to whom Jonas provided such changed description. (Dkt. No. 453, p. 3).

On June 17, 2020, the Court issued a Decision and Order regarding Montalvo's sentencing hearing, finding, *inter alia*, by a "preponderance of the specific evidence before it that [] Montalvo planned, aided and abetted the armed burglary and robbery during which the murders [of the Camachos] occurred…." (Dkt. No. 372, pp. 2-3).  Specifically, this Court found that Montalvo "drove Jonas, Hildalgo, and the juvenile, with the loaded AK-47 rifle and an aluminum baseball bat, to the vicinity of the victims' apartment in his yellow automobile and dropped them off expecting them to use the AK-47 and baseball bat to commit the burglary and

---

[2] Codefendant Hidalgo, who was present with Jonas at the time of the murders of the Camacho brothers, pled guilty before this Court on February 26, 2015, pursuant to a written plea agreement with the government. (Dkt. No. 239).  Hidalgo <u>was</u> called as a government witness at Montalvo's sentencing hearing, and as a result of Hidalgo's cooperation, the government filed a motion to reduce his sentence pursuant to Guideline Section 5K1.1. (Dkt. No. 324).  The Court granted such motion, and on August 17, 2016, sentenced Hidalgo, who had also been convicted of RICO conspiracy in another indictment, to an aggregate term of imprisonment of 330 months. (Dkt. No. 327).

6

robbery. He did not accompany them further and drove away from the scene." (Dkt. No. 372, p. 9).

With respect to Jonas's role in those murders, the Court based upon the evidence presented at Montalvo's sentencing hearing, found as follows:

> After Hildalgo smashed in the door to the victims' apartment with his shoulder sometime after 9:00 p.m., Jonas ran inside and immediately shot Nelson Comacho in the arm with the AK-47, nearly blowing the victim's arm off. Nelson Comacho asked for help. * * *
>
> After Hildalgo and the juvenile did not immediately find money in a front bedroom, where [Montalvo] led them to believe money might be hidden, Hildalgo broke open the door to rear bedroom, only to frantically retreat to the front of the apartment when Miguel Comacho aimed a gun at him. Jonas interceded, shooting Miguel Comacho repeatedly with the AK-47, killing him. With police expected to arrive because of the initial gunfire, and as Hildalgo and the juvenile ran — not having searched the rear bedroom — Jonas stood over the already gravely injured Nelson Comacho and shot him through the head, killing him, before running away with the others. (Dkt. No. 372, pp. 9-10).

On December 1, 2020, the Court issued a variance and sentenced Montalvo to twenty years of imprisonment. (Dkt. No. 387). Montalvo's sentence was affirmed on appeal. *United States v. Montalvo*, No. 20-4176-CR, 2022 WL 4282145, at *2 (2d Cir. Sept. 16, 2022).

As previously noted, Jonas was not called as a government witness at Montalvo's sentencing hearing, and in June of 2015, the government filed notice that it was not going to file a 5K motion on Jonas's behalf. (Dkt. Nos. 267, 268). On June 19, 2015, the Court directed the government to file under seal an affidavit describing the § 3553(e) and § 5K1.1 conduct and circumstances of defendant (11-CR-366-A,

7

Docket Entry, dated June 19, 2015), and Jonas's sentencing was scheduled for September 17, 2015. (Dkt. No. 275).

Following the filing of the government's affidavit under seal (Dkt. Nos. 281, 419), Jonas, on July 27, 2015, filed a motion which sought: (1) to compel the government to file a 5K1.1 motion; and (2) to unseal the transcript of codefendant Montalvo's sentencing hearing. (Dkt. No. 289).  The government responded (Dkt. No. 297), and Jonas replied (Dkt. No. 298).

On September 16, 2015, the Court granted Jonas's motion to adjourn his sentencing pending its decision regarding whether to release Montalvo's sentencing hearing transcripts to Jonas. (Dkt. No. 300).

It was not until several months after Montalvo was finally sentenced by this Court that Jonas sought to move his case to sentencing.  On March 15, 2021, Jonas filed a motion requesting that this Court: (1) direct the government to disclose its grounds for electing not to file a § 5K1.1 motion; (2)  direct disclosure of the minutes and exhibits of codefendant Montalvo's sentencing hearing; (3) set a schedule for Jonas to respond and object to the government's basis for refusing to file a § 5K1.1 motion or other sentencing arguments; and (4) set a date for sentencing. (Dkt. No. 392).[3]  Jonas renewed such motion on April 29, 2021. (Dkt. No. 394).

On September 23, 2021, Jonas filed a motion seeking to be released from custody. (Dkt. No. 408).

---

[3] Unlike defendant Jonas, the government, beginning in late-2018, made repeated requests to this Court seeking to move defendant Jonas to sentencing. (Dkt. Nos. 358, 360, 409, 410).

In or about May of 2023, transcripts of Montalvo's sentencing hearing were eventually provided to Jonas's attorneys pursuant to a protective order (Dkt. No. 420, 421), and on June 7, 2023, a Revised Presentence Investigation Report was prepared. (Dkt. No. 422).

On October 16, 2023, Jonas filed a supplemental motion for a downward departure. (Dkt. No. 440). In it, Jonas essentially argues that even if the government's stated reasons for refusing to file a substantial assistance motion on his behalf were justified, his guilty plea—and corresponding facts that he admitted during his plea allocution—"unequivocally yield[ed] the true identity of the person who shot the two victims." (Dkt. No. 440, ¶12). According to Jonas, by identifying himself as the true murderer of Nelson and Miguel Camacho—he provided the government substantial assistance to the extent that such information helped to exonerate Josue Ortiz who had previously been wrongly convicted in New York State court for such murders. (Dkt. No. 440, ¶¶12-14).

In that regard, Jonas argues that "the substantial assistance [he] provided was not the assistance that the government sought or bargained for, but was significant nonetheless[;] Defendant should therefore receive consideration for this benefit conferred on the government pursuant to the cooperation provisions of his plea agreement." (Dkt. No. 440, ¶18). Finally, to the extent that the passage of the First Step Act following Jonas's plea of guilty significantly lowered the sentence contemplated in his plea agreement, he argues that such fact is "irrelevant" to any determination regarding his entitlement to a substantial assistance reduction, as the refusal to file such a motion can't be based upon the view that "the defendant's

9

sentence is low enough already."  (Dkt. No. 440, ¶¶15-17).  The government responded (Dkt. No. 453), and Jonas replied. (Dkt. No. 454).

II. **Analysis:**

   **A. Delay in Sentencing**

      **i.  Legal Standard**

"[T]o determine whether a defendant has been deprived of [his] due process right to a prompt sentencing, we must consider (1) the reasons for the delay as well as (2) the prejudice to the accused." *United States v. Ray*, 578 F.3d 184, 199 (2d Cir. 2009) (internal quotation marks omitted).

      **ii.  Legal Analysis**

At the outset, the Court observes that it is regrettable that Jonas has not yet been sentenced and nearly nine years have passed since he pled guilty and admitted to shooting Nelson and Miguel Camacho to death with an AK-47.  Stated simply, there is no good reason for the delay in this case.  While the government was rightly concerned about the safety of its witnesses in initially resisting Jonas's efforts to obtain transcripts of Montalvo's sentencing hearing and such sentencing did not ultimately occur until late-2020, defendant appropriately wanted to review such transcripts to determine whether they offered any support to his belief that the government's decision not to file a downward departure motion on his behalf was made in bad faith.

That said and despite filing a motion in September of 2021 wherein he sought release on bail with the conclusory assertion that he had been "incarcerated in local jails or other pretrial detention facilities that lack the programming opportunities and rehabilitative efforts, substance abuse counseling, and educational opportunities available at a Bureau of Prisons facility" (Dkt. No. 408, p.5), defendant has not developed any argument regarding how such lack of programming violated his due process rights. "After conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair. But because [defendant] advanced no due process claim here, we express no opinion on how he might fare under that more pliable standard." *Betterman v. Montana*, 578 U.S. 437, 448, 136 S. Ct. 1609, 1617–18, 194 L. Ed. 2d 723 (2016) (citation omitted).

Even accepting that Jonas bears no responsibility for the sentencing delay in this case, his claim must fail as he has not made a showing of actual and demonstrable prejudice to him. *United States v. Ray*, 578 F.3d at 200–01. To prove a due process violation as a result of a sentencing delay, the prejudice claimed by the defendant must be substantial and demonstrable. See *Perez v. Sullivan*, 793 F.2d 249, 256 (10th Cir. 1986) ("Because the rights of society proportionately increase [after a defendant is convicted], the prejudice claimed by the defendant [objecting to a sentencing delay] must be substantial and demonstrable."); *see also, United States v. Nelson-Rodriguez*, 319 F.3d 12, 61 (1st Cir. 2003) (in the context of a speedy sentencing claim, stating that "the courts have great reluctance to find a speedy trial deprivation where there is no substantial and demonstrable prejudice").

11

"Lack of programming, while to a degree prejudicial, is not sufficient to overturn a conviction based upon a delay in sentencing." *United States v. Reed*, No. 10-CR-80, 2012 WL 5197972, at *3 (E.D. Wis. Oct. 19, 2012); *see United States v. James*, 712 F. App'x 154, 163 (3d Cir. 2017)(recognizing that although there may be cognizable prejudice stemming from being confined in a local jail rather than federal prison, such prejudice "is not a particularly sizable prejudice" and standing alone is insufficient to establish a due process violation).

Unquestionably, the first several years of delay in sentencing in this case inured to the benefit of Jonas. Following Jonas's plea, Congress enacted §403(a) of the First Step Act, which eliminated the so-called § 924(c) "stacking" provisions, whereby multiple § 924(c) charges in the same indictment could yield enhanced consecutive mandatory minimum sentences. That statute, which became effective December 21, 2018, declined to make the First Step Act's amendment to § 924(c)(1)(C) fully retroactive. *See* First Step Act, § 403(b), 132 Stat. at 5222 (providing that the First Step Act's amendments to § 924(c)(1)(C) apply only to an "offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment"). Had Jonas been sentenced prior to December 21, 2018, he would not have gained the considerable benefit conferred on him by the statute's anti-stacking provisions. *See*, *United States v. Johnson*, No. 10-CR-6128 CJS-6, 2021 WL 5103954, at *5 (W.D.N.Y. Nov. 3, 2021). In fact, from Jonas's perspective, the delay in pushing his sentencing date until after December 21, 2018, operated to lower the mandatory minimum term of imprisonment he faced at the time of sentence from 35 years to 20

years.[4] Such a substantial reduction certainly tempers any claim of prejudice. *See United States v. James*, 712 F. App'x at 163 ("whatever prejudice did arise from this delay [in sentencing] was at least partially offset by the substantial benefits [defendants] received from delay.").

In the end, the uncontroverted evidence before this Court, including Jonas's own admissions, establishes that he brutally and viciously murdered both Nelson and Miguel Camacho at close range using an AR-15 type rifle. Having committed such a heinous crime, defendant fails even to articulate—much less demonstrate—that he sustained any substantial prejudice by the prolonged sentencing delay in this case. *See*, *United States v. Nieves*, 648 F. App'x 152, 155 (2d Cir. 2016) (eight-year delay in sentencing did not amount to sue process violation where defendant failed to demonstrate substantial prejudice). Jonas's failure to prove substantial prejudice by the significant sentencing delay in this case is fatal to any claim that his due process rights were violated. Absent any such violation, defendant is not entitled to release from custody pending sentence. *See*, 18 U.S.C. § 3143(a).

---

[4] Since Jonas had not been sentenced as of the date of the enactment of the First Step Act—i.e., December 21, 2018—the mandatory consecutive term of imprisonment he faces under his second count of conviction has been reduced from 25 years to 10 years. (Dkt. No. 422, ¶¶4, 60). Consequently, Jonas's aggregate total "guideline range" for imprisonment has been reduced from 35 years imprisonment to 20 years (240 months) imprisonment. (Dkt. No. 422, ¶¶60-64).

**B. Government's Refusal to File A Substantial Assistance Motion**

    **i. Legal Standard**

Guideline §5K1.1 "gives the government the power, not the duty, to file such a motion when it has determined that a defendant has substantially assisted, *Wade v. United States*, 504 U.S. 181, 184-85, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992), and judicial review of the prosecutor's decision whether to make a motion pursuant to section 5K1.1 is narrowly circumscribed." *United States v. Leonard*, 50 F.3d 1152, 1157 (2d Cir. 1995). Where, as here, the prosecutor's decision whether to seek a reduced sentence arises from cooperation provisions contained within the parties' plea agreement, courts review that agreement to determine whether the government "lived up to its end of the bargain," *Id.*, and "whether the government acted fairly and in good faith." *United States v. Fernandez*, 127 F.3d 277, 285–86 (2d Cir. 1997).

Cooperation agreements are interpreted according to principles of contract law. *See United States v. Gregory*, 245 F.3d 160, 165 (2d Cir. 2001). Although the terms of a cooperation agreement are reviewed *de novo*, *see United States v. Padilla*, 186 F.3d 136, 139 (2d Cir. 1999), "[b]ecause the prosecution often is in the best position to evaluate the quality of a defendant's cooperation and to decide whether to make a substantial-assistance motion, this decision, like other prosecutorial determinations, may be subjected to only limited review." *United States v. Knights*, 968 F.2d 1483, 1487 (2d Cir. 1992). Accordingly, "where the agreement is conditioned on satisfaction of the obligor, the condition is not met 'if the obligor is honestly, even though unreasonably, dissatisfied.'" *United States v. Rexach*, 896 F.2d 710, 713 (2d Cir. 1990) (citing Restatement (Second) of Contracts § 228, cmt.

a). Additionally, "a defendant has no right to discovery or an evidentiary hearing unless he makes a substantial threshold showing." *Wade*, 504 U.S. at 186, 112 S.Ct. 1840 (internal quotation omitted).

    **ii. Legal Analysis**

Here, the Court concludes that the government's refusal to file any motion seeking a reduction of defendant's sentence based upon substantial assistance was made in good faith and was well-founded because Jonas provided a changed description of the person who drove him to the scene of the murders. Since the government first indicated that it would not be filing a substantial assistance motion on the Jonas's behalf, it has consistently indicated that its reason for doing so was because Jonas's physical description of the person who drove him (and others) to the scene of the murders had changed. (Dkt. No. 419 [affidavit of AUSA Tripi, dated 7/15/2015]). While initially providing a description which was consistent with that on Montalvo (*i.e.*, "heavyset") in his pre-plea proffer, that description changed to "thin" after his plea as he was being prepped to testify as a government witness at Montalvo's sentencing hearing. (Dkt. Nos. 419 and 453). Jonas does not refute this fact, and in fact, as a result of his changed description, Jonas was not only <u>not</u> called as a government witness at Montalvo's sentencing hearing, but instead, Jonas's changed description was introduced by the defense on behalf of Montalvo himself.

Further, the parties agree that following his plea Jonas, during a proffer session with the government, refused to answer certain questions regarding his own

15

conduct involving details of the incident in which he murdered the Camacho brothers. (Dkt. Nos. 297, p. 5; 440, p. 4). His refusal to answer such questions was in direct contravention of the terms and conditions of his cooperation agreement with the government. *See*, Dkt. No. 244, ¶26 ("It is a condition of this agreement that the defendant must, at all times, give complete, truthful and accurate information and testimony and not withhold information from the government or refuse to testify truthfully and completely.").

In view of the foregoing, it may not be said that the government breached its agreement with the defendant or failed to act in good faith. *See United States v. Brechner*, 99 F.3d 96, 99-100 (2d Cir. 1996) (holding that the government did not act in bad faith when it declined to file a § 5K1.1 motion where defendant breached his cooperation agreement by lying during the course of cooperation, and thus destroying his credibility as a witness). Indeed, the record establishes that it was the defendant—not the government—who failed to live up to his end of the bargain.

In his request asking this Court to order the government to file a §5K1.1 motion on his behalf, Jonas also suggests that the fact that he pled guilty and admitted to killing the Camacho brothers warrants such a motion since such admission had the effect of exonerating another individual who had been unjustly convicted of such killings in New York State court. (Dkt. No. 440, pp.4-6). In admitting his own involvement in the offense of conviction, defendant accepted responsibility for his own criminal actions but did not provide substantial assistance in the investigation of prosecution of others. USSG § 5K1.1, comment., n. 2.

(Application Note 2 provides in relevant part: "The sentencing reduction for assistance to authorities shall be considered independently of any reduction for acceptance of responsibility."); *see, United States v. Melendez*, 518 U.S. 120, 128, 116 S. Ct. 2057, 2062, 135 L. Ed. 2d 427 (1996). However, based upon Jonas's two counts of convictions, the Chapter Three adjustments for acceptance of responsibility do not apply to him. *See, U.S.S.G. 2K2.4(b)*("[I]f the defendant, whether or not convicted of another crime, was convicted of violating section 924(c) … of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute. Chapters Three and Four shall not apply to that count of conviction.").

Finally, Jonas chastises the government for its refusal to file a 5K by suggesting that the government is engaging in "a results-oriented calculation rather than a process-oriented calculation" in which it has taken the view that "the defendant's sentence is low enough already." (Dkt. No. 440, p.7).  However, the Court finds that, in fact, it is Jonas's logic that is flawed. The Government's justification for its refusal to file a 5K on behalf of defendant is predicated principally upon their belief that Jonas failed to comply with the process his cooperation agreement required—*i.e.,* that he always provide complete and truthful information and testimony.  Jonas, on the other hand, in asking the Court to compel such motion notwithstanding Jonas's failure to comply with the very process to which he agreed in entering into his cooperation agreement, is the party urging this Court to elevate results over process.  By seeking to compel the government to file a substantial

17

assistance motion on the ground that he was partially truthful in admitting his own involvement in a double homicide—thereby exonerating an individual who had been wrongly convicted of such murders—Jonas asks this Court—and the government—to overlook his lack of candor or completeness viz-a-vis not only his involvement but the involvement of others in such events.

According to the cooperation provisions of his plea agreement with the government, Jonas's obligation to provide complete and truthful information and testimony is absolute.  Unlike horseshoes and hand grenades, when it comes to a cooperator's obligation to tell the truth, close enough is not good enough.  Jonas's recantation and alteration of the description of the events leading up to the robbery/murders supports the Government's belief that Jonas was less than completely truthful when it came to Montalvo's complicity in the murders.

Yet, even if the government is of the view that "the defendant's sentence is low enough already" and their refusal to seek a further reduction of sentence derives from that view, the Court nevertheless concludes that the government is not acting in bad faith in refusing to file a motion to reduce Jonas's sentence.

As the Supreme Court has recognized, 18 U.S.C. §3553(e) and §5K1.1 establish a binary motion system, "which permits the Government to authorize a departure from the Guidelines range while withholding from the court the authority to depart below a lower statutory minimum." *United States v. Melendez*, 518 U.S. at 125. "The existence of such a binary motion system necessarily implies that the Government *may* in its discretion conclude in good faith that a defendant is entitled

to a § 5K1.1 motion on the basis of cooperation, but that the value of this cooperation was not so great as to merit a § 3553(e) motion authorizing the district court to sentence below a mandatory minimum. In such circumstances, the sentencing discretion of the district court is necessarily constrained. But this fact is not enough, standing alone, to support the conclusion that the Government has therefore acted in bad faith." *United States v. Trimm*, 999 F.3d 119, 129 (2d Cir. 2021). Here, Jonas's sentencing range for his offenses of conviction under the U.S.S.G. and his statutory mandatory minimum for such offenses are one in the same. *See, U.S.S.G. 2K2.4(b).* That the government may be of the view that Jonas, having committed a brutal double homicide, ought not be subject to a sentence of less than 20 years imprisonment certainly does not strike the Court as an expression of bad faith.

### III. CONCLUSION

For the foregoing reasons, Jonas's motion seeking to compel the government to file a motion for downward departure under Guidelines Section 5K1.1 (Dkt. No. 289, 298); his supplemental motion for a downward departure. (Dkt. No. 440); as well as his motion for release from custody (Dkt. No. 408) are **DENIED.** Further, Jonas's motion for disclosure and sentencing (Dkt. No. 392) as well as his supplemental motion for disclosure and sentencing (Dkt. No. 394); together with the government's motions to decide and schedule sentencing (Dkt. Nos. 358, 360, 371, and 410) are all **DENIED AS MOOT**.

The parties are directed to appear at a sentencing status conference on **February 21, 2024, at 10:00 a.m.**, at which time a date certain for sentencing will be set.

**IT IS SO ORDERED.**

                                                *s/Richard J. Arcara*
                                                HONORABLE RICHARD J. ARCARA
                                                UNITED STATES DISTRICT COURT

Dated:  January 23, 2024
        Buffalo, New York